NOT DESIGNATED FOR PUBLICATION

No. 121,878

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TARON ALONZO HUGGINS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Opinion filed January 8, 2021. Affirmed.

*Nicholas David*, of The David Law Office LLC, of Lawrence, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.

PER CURIAM: A jury convicted Taron Alonzo Huggins of two counts of aggravated robbery and one count of conspiracy to commit aggravated robbery. Huggins appeals his convictions, challenging the sufficiency of the evidence and alleging that the district court committed clear error when instructing the jury. Huggins also appeals his sentence, contending the district court failed to make a finding needed to trigger his duty to register as a violent offender. Finding no reversible error, we affirm Huggins' convictions and sentence.

*Factual and Procedural Background*

Two men robbed Ismael Garcia and Lena Foster in February 2017. Deontra Cay—Huggins' cousin—admitted his involvement in that robbery while testifying at Huggins' trial. Cay also testified that Huggins was also involved in the robbery. Huggins did not testify. We summarize below the facts proved at trial.

*The Robbery*

In February 2017, Garcia lived in a halfway house with his roommate Charles Harris. On February 5, Harris walked into their room shortly after Garcia finished counting $6,200 cash and saw the cash laid out on Garcia's bed. On February 6, Garcia took that cash to his bank to deposit it onto prepaid cards. On February 7, Garcia left the halfway house. Before leaving, Garcia signed out, noting that he was going to the Hillcrest Community Center, and got a pass to leave, as the rules required.

After Garcia left, Harris contacted Huggins and told him that Garcia would be at the community center and carrying $5,000 cash. Shortly after speaking to Harris, Huggins contacted his cousin, Cay. When Huggins picked Cay up, Huggins asked Cay if he had a gun on him. Cay replied that he did and asked why he needed it. Huggins responded that they were going to "rob somebody"—a "Mexican dude"—at the community center. Huggins then drove them there.

When Huggins and Cay entered the community center, they signed in. Huggins gave the receptionist his identification card and used his real name. Cay pretended not to have an identification card and signed in under a fake name—"John Smith." They then began searching for Garcia. When they had trouble finding him, Huggins called Harris—whom Cay described as Huggins' "friend" "at the halfway house." Harris assured Huggins

2

that Garcia was at the community center because he had "signed a pass at the halfway house saying that he was going [there]."

Shortly after that call, Huggins and Cay found Garcia and Foster in a gazebo near the community center. Huggins approached Garcia and asked for a lighter. Cay drew his gun and pointed it at Garcia, commanding him to empty his pockets and Foster to hand over her purse. Garcia and Foster complied by putting his wallet and her purse on the table. Huggins and Cay then demanded that Garcia give them his pants and jacket. When Garcia refused, Huggins commanded Cay to shoot him. Garcia then complied. After Garcia put his clothes on the table, Cay and Huggins grabbed them and ran to Huggins' car.

Huggins then drove away. The men checked the items for cash, found none, and threw the stolen property out of the car window. Later that evening, Huggins and Cay met with Harris, and Huggins told Harris that he owed them for sending them on a "bogus mission."

*Police Report, Investigation, and Arrest*

After Huggins and Cay left the community center, Garcia and Foster called the police. Officer Michael Cope, Chief of Police for Shawnee County Parks and Recreation, responded. Garcia told Cope that he recognized Huggins but could not remember his name. Garcia later remembered Huggins' nickname—"Popper."

Using that nickname, Garcia told his roommate, Harris, that he thought Huggins was involved in the robbery. Harris replied that he knew Huggins and would call him to see what was going on. Harris then left to call Huggins. When Harris returned, he told Garcia that Huggins had not been involved in the robbery because he had been at work all day. Garcia disbelieved the alibi because he was certain Huggins was involved.

3

Two days later, Cope recovered Garcia's wallet and met Garcia for another interview. After getting more information, Cope drove to Huggins' home to look for his car, which Garcia had described as a black Chevy Cobalt. Cope found the car, got the surveillance video from the community center, and retrieved the log of its sign-in sheet for the day of the robbery. That sign-in sheet showed Huggins' name with the name "John Smith" written under it. The video showed Huggins and "another unnamed individual" roaming the Hillcrest area—"the park, the hallways, the weight room"—on the day Garcia and Foster were robbed at gunpoint. Police eventually arrested Cay, Harris, and Huggins.

*Pretrial Proceedings*

The State charged Huggins with one count of aggravated robbery for taking Garcia and Huggins' property. The grand jury later indicted Huggins for two counts of aggravated robbery, alleging taking from Garcia and Foster respectively, and one count of conspiracy to commit aggravated robbery. Although a robbery may be committed through a taking "by force" or by "threat of bodily harm," K.S.A. 2019 Supp. 21-5420(a), the indictment alleged only that Huggins took Garcia and Foster's property "by force." The conspiracy charge alleged that Huggins conspired with Harris to rob Garcia and did not name Cay as a coconspirator.

*Jury Trial*

At the jury trial the State presented testimony from several people, including Garcia and Foster. Both testified that Huggins and Cay robbed them at gunpoint. Neither testified that they were physically harmed during the robbery.

In exchange for a plea deal, Cay testified against Huggins. He gave a detailed account of his and Huggins' involvement in the robbery. Cay admitted that he used the

gun and demanded Garcia and Foster hand over their property. Cay also testified that Huggins planned the robbery and yelled at him to shoot Garcia when Garcia refused to take his clothes off. Cay explained that Huggins formed the plan to rob Garcia after someone from Garcia's halfway house had told Huggins that Garcia would be at the community center with $5,000 cash. Cay did not name that person but testified that he and Huggins had met him after the robbery. Although Cay did not identify Harris by name, circumstantial evidence shows that this person was Harris; Garcia testified that although he did not know the person's last name, his roommate's name was Charles. Cope testified that a "Charles Harris" was a resident at the halfway house when Garcia was robbed, and the State admitted Huggins' phone records which established that he conspired with Harris to rob Garcia.

Despite the narrower terms in the indictment, the district court instructed the jury to consider both "by force" and "threat of bodily harm" in deciding whether Huggins had committed aggravated robbery against Garcia and Foster. It also instructed the jury to consider whether Huggins conspired with Cay and Harris to commit aggravated robbery. The jury ultimately found Huggins guilty of both counts of aggravated robbery and one count of conspiracy to commit aggravated robbery.

*Sentencing*

Before sentencing, Huggins moved for a durational departure. The district court partially granted that motion, imposing a durational departure sentence of 180 months imprisonment and running each count concurrently. After the district court announced its sentence, the State noted Huggins' duty to register as a violent offender under the Kansas Offender Registration Act (KORA). The district court directed Huggins to complete the necessary paperwork but did not say that Huggins had used a deadly weapon in committing his felonies. Later, though, the district court approved a journal entry stating

5

Huggins had to register because he had committed a felony offense with a deadly weapon. Huggins appeals.

*Does Sufficient Evidence Support the Verdicts?*

Huggins first asserts that his convictions for aggravated robbery and conspiracy to commit aggravated robbery are not supported by sufficient evidence. But at the heart of this argument is Huggins' contention that the district court erroneously instructed the jury. As for his aggravated robbery convictions, Huggins maintains that the State did not prove a taking "by force" as the indictment alleged. Huggins concedes that the State proved he committed aggravated robbery by "threat of bodily harm," but argues this fails to prove a taking by force.

Huggins similarly challenges the sufficiency of the evidence supporting his conspiracy conviction. Huggins contends that the State failed to present evidence that he conspired with Harris—the only coconspirator named in the indictment. Instead, Huggins argues that the facts show only that he conspired with Cay, who was not an alleged coconspirator.

Huggins thus contends that the evidence admitted at trial relates to a different theory of the crime than the indictment alleged. He contends that how he took the victims' property and the coconspirators named in the jury instructions do not match those alleged in the indictment. Because Huggins' insufficient evidence arguments depend on his claims of instructional error, we first address Huggins' claims of instructional error.

*Did the District Court Err When Instructing the Jury?*

Huggins argues, as an alternative to his claim of insufficient evidence, that the district court erred by instructing the jury on theories of aggravated robbery and conspiracy to commit aggravated robbery not charged in the indictment. It is a general rule in Kansas that jury instructions must follow the charges in the charging document. See *State v. Richardson*, 290 Kan. 176, 181-82, 224 P.3d 553 (2010) (A trial judge has a duty to inform the jury of every essential element of a crime charged. Omission of an essential element in jury instructions is clearly erroneous and requires reversal of the conviction.) Moreover, "[a] jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous." *State v. Trautloff*, 289 Kan. 793, 802, 217 P.3d 15 (2009).

The State acknowledges this general rule but responds that the only reason the jury instructions differed from the indictment is because Huggins requested the instructions before trial, approved them during the instruction conference, and did not object to them before the court instructed the jury. In other words, because Huggins invited the erroneous instructions, he cannot complain about them on appeal. We agree.

*Preservation and Standard of Review*

Appellate courts analyze each jury instruction claim under a three-step process: (1) whether the court can or should review the issue, that is, whether there is a lack of appellate jurisdiction or whether there was a failure to preserve the issue; (2) the merits of the claim; and (3) whether any error found was harmless. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). If the defendant did not make a contemporaneous objection to a jury instruction, appellate courts will review the claim of error for clear error. K.S.A. 2019 Supp. 22-3414(3); *McLinn*, 307 Kan. at 318. The appellate court also reviews for

clear error if the defendant objected at trial but on a different basis than he or she later argues on appeal. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016).

When we apply the first of these steps—whether we should review the issue—we consider the rule that a defendant may not invite error and then complain of the error on appeal. See *State v. Bello*, 289 Kan. 191, 193, 211 P.3d 139 (2009).

Our Supreme Court recently reaffirmed the invited error doctrine in the context of jury instructions in *State v. Pattillo*, 311 Kan. 995, 1014, 469 P.3d 1250 (2020):

> "Generally, under the invited error doctrine, '"a litigant who invites and leads a trial court into error will not be heard on appeal to complain of that action."' *State v. Fleming*, 308 Kan. 689, 696, 706, 423 P.3d 506 (2018). In the context of jury instructions, we do not apply the rule in a formalistic or bright-line way, however. 308 Kan. at 701-02. But we have applied the doctrine when a party requests the instruction before trial, the error was as obvious before trial as when the judge gave the instruction, and the party did not object to the instruction before the judge read it to the jury. 308 Kan. at 703."

Using this three-part analysis as guidance, we find that Huggins invited the instructional errors he raises on appeal. First, before trial, Huggins requested the broader language in each of the three instructions he challenges on appeal. As to the two aggravated robbery counts, Huggins proposed the elements instructions saying that he took Garcia and Foster's property by "threat of bodily harm," although the indictment alleged only a taking "by force." The district court included both in its instructions. As to the conspiracy elements instruction, Huggins proposed an instruction including both Harris and Cay's names: "The defendant agreed with Michael [*sic*] Harris and Deontra Cay to commit Aggravated Robbery." The district court used that instruction, although the indictment alleged only that Huggins agreed with Harris.

Second, the error of deviating from the language in the indictment was as obvious before trial as it was when the court instructed the jury. Huggins proposed the instructions before trial and nothing at trial changed the legal argument he now makes. In other words, his counsel could have assessed and determined before trial that the judge should conform the language in the instructions to the language in the indictment in the manner he now suggests. These circumstances support the State's position that Huggins invited the error.

Third, Huggins did not object to the instructions before the judge read them to the jury. Instead, at the instruction conference, Huggins agreed to the instructions he now challenges and did not object to broadening the instructions by including "threat of bodily harm," or adding Cay's name as a coconspirator.

Under these circumstances, the invited error doctrine squarely applies and precludes appellate review of Huggins' instructional error claim. See *State v. Cottrell*, 310 Kan. 150, 162, 445 P.3d 1132 (2019) (applying invited error rule where defendant actively pursued the instruction). Because we cannot find error in the district court's instruction to the jury, we cannot reach Huggins' claim of insufficient evidence.

*Did the District Court Make the Necessary Findings to Require Huggins to Register as a Violent Offender?*

In his final argument on appeal, Huggins asks this court to vacate the district court's order requiring him to register as a violent offender under KORA because the district court failed to find on the record that he used a deadly weapon. Huggins argues that the court thus failed to comply with K.S.A. 2019 Supp. 22-4902(e)(2). This statute defines a "violent offender" as one who "is convicted of any person felony and the court makes a finding *on the record* that a deadly weapon was used in the commission of such person felony." (Emphasis added.) K.S.A. 2019 Supp. 22-4902(e)(2).

Huggins was convicted of aggravated robbery, a person felony. But his crimes of conviction did not automatically qualify him as a violent offender. Huggins is correct that given his convictions, he has no obligation to register under KORA unless "some statutorily permitted judicial fact-finding classifies the defendant as an 'offender.'" *State v. Thomas*, 307 Kan. 733, 748, 415 P.3d 430 (2018). To be deemed a violent offender under the facts here, KORA required the court to make a finding on the record that a deadly weapon was used when Huggins committed his crime of aggravated robbery.

The parties agree, and the record confirms, that the district court did not state at the time of Huggins' conviction or sentencing that anyone had used a deadly weapon. (Huggins does not contend that the district court's notice was untimely, as in *State v. Juarez*, 312 Kan. __, 470 P.3d 1271, 1273 [2020]). The district court merely stated at his sentencing that Huggins was required to register based on "the offense and [his] convictions."

But the "deadly weapon" finding is in the district court's journal entry, which states that Huggins' committed his felony with a deadly weapon. Thus, the question here is solely whether the journal entry's finding is "on the record," as K.S.A. 2019 Supp. 22-4902(e)(2) requires.

Huggins argues that our Supreme Court's decision in *Thomas*, resolves this issue. *Thomas* held:

> "when the classification of a defendant as an 'offender' requires district court fact-finding, as here, that fact-finding is itself one of the statutorily defined conditions precedent. Without such a fact-finding, the defendant cannot be an offender under KORA, and the obligation to register never springs into existence." *Thomas*, 307 Kan. at 749.

But in *Thomas*, the journal entry did not mention Thomas' duty to register. So *Thomas* does not address the issue here, where the journal entry of sentencing includes the "deadly weapon" finding.

This case is more like *State v. Marinelli*, 307 Kan. 768, 415 P.3d 405 (2018). There, the Kansas Supreme Court found that the journal entry "contains the requisite finding and is in the case's record." 307 Kan. at 788. Similarly, in *State v. Carter*, 311 Kan. 206, 211, 459 P.3d 186 (2020), that court found "the journal entry included in the record of this case shows the district judge made the necessary finding under K.S.A. 2019 Supp. 22-4902(e)(2)." Huggins might have asserted that a sentence pronounced from the bench typically controls over a differing journal entry, see *Abasolo v. State*, 284 Kan. 299, Syl. ¶ 3, 160 P.3d 471 (2007), but "that rule is not applicable here because of the majority holding in *Thomas* that registration is not part of a defendant's sentence." *Carter*, 311 Kan. at 210. Huggins' arguments on appeal disregard the journal entry and do not explain why it should not qualify as an adequate KORA finding on the record.

Because the journal entry here includes the required "deadly weapon" finding, the district court adequately complied with K.S.A. 2019 Supp. 22-4902(e)(2). We affirm Huggins' registration requirement.

Affirmed.