No. 116,356

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DARRIN D. HIRSH,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court reviews a district court's response to a mid-deliberation jury question for an abuse of discretion. To the extent that it is necessary to determine whether the district court's response was a correct statement of the law, an appellate court is presented with a legal question, subject to unlimited review. But when looking at which legally appropriate response the court should have made, an appellate court accords the district court the deference of looking to whether no reasonable person would have given the response adopted by the district court.

2.

When a jury asks a question about the district court's instructions, the district court must respond in some meaningful manner or seek additional clarification or limitation of the request.

3.

A district court's erroneous response to a jury question is subject to harmless error analysis. The Kansas Supreme Court has held that to find an error harmless under K.S.A. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error did not affect a party's substantial rights, meaning it will not or did

1

not affect the trial's outcome. The party benefitting from the error always bears the burden of proving it harmless under this standard.

4.

Multiplicity is the charging of a single offense in several counts of a complaint or information. Multiplicity can result in multiple punishments for the same offense, thus violating the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. An appellate court has unlimited review over issues involving multiplicity as they present questions of law.

5.

Appellate courts employ a two-step process to evaluate claims of prosecutorial error. First, the court must determine whether error occurred by deciding whether the prosecutor's actions fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error has occurred, then the appellate court must determine whether the error prejudiced the defendant's right to a fair trial under the harmless error standard.

6.

Generally, prosecutors cannot offer juries their personal opinions on the credibility of witnesses because such comments are unsworn, unchecked testimony, not commentary on the evidence of the case.

7.

To establish a violation of a prosecutor's duty to disclose evidence pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the court must find three elements:  (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been

suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.

8.

An appellate court's review of a district court's decision on a motion to recall a jury is limited to abuse of discretion. A district court abuses its discretion in denying a motion for new trial based on juror misconduct if the defendant establishes that an act of the jury constituted misconduct and the misconduct substantially prejudiced his or her right to a fair trial.

9.

Though intentionally deceptive responses or nonresponses constitute misconduct, jurors are not required to volunteer information that they think or suspect may be of interest to counsel in the jury selection process.

10.

Though any one single error may not warrant reversal of any convictions, those errors when considered collectively may be so serious as to merit reversal. The reversibility test for cumulative error is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under the cumulative effect rule, however, if the evidence is overwhelming against the defendant.

Appeal from Barton District Court; RON SVATY, judge. Opinion filed September 29, 2017. Affirmed in part, reversed in part, vacated in part, and remanded.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

3

Before M ALONE, P.J., P IERRON and B RUNS, JJ.

M ALONE, J.: Darrin D. Hirsh appeals his convictions of one count of aggravated assault, two counts of criminal threat, and one count of domestic battery. Hirsh claims: (1) The district court's response to a jury question concerning the deadly weapon used in the aggravated assault allowed the jury to convict him of an uncharged crime; (2) his criminal threat convictions are multiplicitous; (3) the State improperly commented on the victim's credibility; (4) the State committed a *Brady* violation; (5) the district court erred in refusing to recall the jury; (6) cumulative error deprived him of a fair trial; and (7) the district court violated his constitutional rights by making a "deadly weapon" finding to impose violent offender registration. We agree with Hirsh's first claim concerning the district court's response to the jury question; thus, we reverse his conviction of aggravated assault, vacate the sentence on that conviction, and remand for a new trial on that charge. However, we affirm the remainder of the district court's judgment.

F ACTUAL AND P ROCEDURAL B ACKGROUND

Hirsh and Candice Hirsh married in 1997 and settled in Great Bend, Kansas, where Hirsh worked as a trooper for the Kansas Highway Patrol (KHP). Candice worked as a case manager for the Great Bend Center for Counseling and Consultation. In 2011, the Hirshes' marriage began to deteriorate as Candice suspected that Hirsh was having an affair with a work colleague, Ashley Martell. While Martell was in the KHP Academy, she lived in an apartment on the Hirshes' property, which caused frequent arguments between Hirsh and Candice.

On March 12, 2013, Martell and Hirsh were in the basement of Hirsh's house. Candice became upset and yelled at Hirsh to get his girlfriend and his belongings and to leave the house. Martell left, but Hirsh remained at the house. Candice later gave the following account of what happened next. According to Candice, Hirsh pushed her to the

4

ground and dragged her by her hair through their dining room. He then choked Candice against a wall in the hallway. Eventually, Hirsh released his hold on Candice and she went into her son's bedroom. Hirsh entered the bedroom holding a gun, which he pressed against Candice's head. He then placed a pillow over her face, suffocating her all the while holding the gun against her head. During the assault, Hirsh told Candice that it would all be over soon. Candice asked him not to let their children see her that way. Hirsh responded, "[d]on't worry because they're going with you." Hirsh abruptly left Candice in the bedroom and left home.

After Hirsh left, Candice called her friend, Stephanie Jacobs, whose husband, Dave Jacobs, was also a trooper. Candice told Stephanie about Hirsh's attack, but she did not mention the gun. Stephanie urged Candice to call the police, but Candice refused because she did not want Hirsh to get into trouble. Stephanie then called Candice's father. When he arrived at Candice's house, she told him that Stephanie had misunderstood their phone conversation and that she and Hirsh only had a verbal argument.

The next day, Candice went to the Jacobs' house where she told them more about the fight, including the fact that Hirsh had held a gun to her head along with the pillow. Both Jacobs observed bruising and marks on Candice's arms, back, and neck. The Jacobs again urged Candice to tell the police, but she refused, saying that no one would believe her. Candice then called her work supervisor, Talaya Schwartz, and told her that she needed a few days off work because she and Hirsh were having marital issues. Candice told Schwartz that she and Hirsh had a physical altercation, but she did not elaborate.

Meanwhile, Dave called his supervisor at the KHP, Lieutenant Steve Billinger, and told Billinger that Candice had informed him that Hirsh had held a gun to her head and threatened her life. Billinger contacted his supervisor, who told him not to get involved in the marital disputes of a KHP trooper and that if domestic violence had occurred, Candice should report it to the police. Billinger relayed this message to Dave

and made it clear that KHP would not get involved if Candice did not want to involve local law enforcement.

Hirsh returned home the next day, and Candice did not report the incident to the police. Almost a year later, however, Schwartz spoke to Candice about her poor work performance and her concerns that Candice's productivity had suffered during the past year. Eventually, Candice told Schwartz about the incident on March 12, 2013. Schwartz urged Candice to call the police, but Candice refused. However, Schwartz convinced Candice to tell her parents about the incident. While on the way to her parents' house, Candice suffered a severe panic attack and her parents drove her to the hospital.

After Candice's release from the hospital, Schwartz and Stephanie drove Candice to the Family Crisis Center, where Candice disclosed to Detective Sharon Wondra that Hirsh attacked her in March 2013. The Kansas Bureau of Investigation (KBI) was asked to investigate the case, and Candice told a KBI agent about the incident. During the investigation, Candice disclosed that Hirsh tried to persuade her to recant her allegations and he contacted her a couple of times in violation of a protective order.

Meanwhile, Schwartz told a relative, Barton County Sheriff's Deputy Kyle Reed, about Candice's allegations. Reed did not report the incident to any other officer in the sheriff's department. Eventually, Undersheriff Bruce Green learned about Reed's involvement with the case and wrote a misconduct report due to Reed's failure to report the information to an on-duty deputy or the duty officer in the sheriff's department.

On June 27, 2014, based on the KBI investigation of the case, the State charged Hirsh with one count of aggravated assault committed with a deadly weapon, to-wit: a handgun, two counts of criminal threat, one count of misdemeanor domestic battery, two counts of misdemeanor witness intimidation, and two counts of violating a protective order. Hirsh's jury trial began on December 16, 2015.

6

At trial, Candice testified and recounted Hirsh's assault on March 12, 2013. She stated that while Hirsh was smothering her face with a pillow and holding a gun to her head, she accepted that she was going to die. Candice also explained that it took her so long to report the incident to law enforcement and that she had lied about the altercation only being verbal because she still loved Hirsh and she did not want to get him into trouble. She also testified that after she disclosed the incident to Wondra, Hirsh left her a voicemail message telling her to recant her story because his job was at risk. Candice testified that Hirsh called again a few days later and told her that she needed to recant.

Stephanie testified next. She stated that on the night of March 12, 2013, she received a call from Candice; Candice was crying and told her that she had a bad fight with Hirsh and she was afraid he was going to come back to the house. Candice then told Stephanie the fight was physical and that she thought she was going to die. Stephanie urged Candice to call the police, but she refused. The next morning, Candice came to Stephanie's house. Stephanie testified that Candice had red and purple marks around her neck and bruises on her arm. Candice told Stephanie the injuries were from Hirsh. Stephanie further testified that Candice then told her that Hirsh held a gun to her head when he was smothering her with the pillow.

Dave also testified about Candice's visit to his home the morning after the incident. He stated that Candice told him that Hirsh "beat the hell out of" her. He further stated that Candice told him that Hirsh had put a gun to her head. Finally, Dave testified about Candice's injuries and said that he observed bruising on her arms and neck and that Candice told him Hirsh had caused the injuries. Dave asked Candice to call the police, but she refused, telling him that no one would believe her.

Schwartz also testified. She stated that Candice came to her office the morning after the incident and asked for time off work. Schwartz recalled that Candice "was obviously disheveled and upset and looked like she hadn't slept at all." Candice told

7

Schwartz that she and Hirsh were having issues and there had been a physical altercation. Schwartz testified that Candice changed after the incident and became very distracted and distant at work. Schwartz testified that Candice disclosed the details of the March 12, 2013 incident when she brought her into her office to talk about her work performance.

Additional witnesses testified for the State about the investigation. Hirsh did not testify at trial, but his defense was a complete denial of Candice's allegations. Hirsh challenged the credibility of Candice's testimony due to inconsistencies in her statements. In particular, Hirsh pointed to the fact that Candice did not mention that Hirsh used a gun during the assault in some of her initial reports about the incident. Hirsh also called several character witnesses who testified that Hirsh had a calm and peaceful demeanor.

After the evidence, the State dismissed one count of violating a protective order. During deliberations, the jury asked the district court, "May the pillow be considered as a deadly weapon the same as a gun?" Over Hirsh's objection, the district court responded, "Please refer to the jury instructions." The jury found Hirsh guilty of aggravated assault, two counts of criminal threat, and domestic battery; he was acquitted of both counts of witness intimidation and the remaining count of violating a protective order.

The district court held a sentencing hearing on May 9, 2016. After finding that Hirsh had no prior criminal history, the district court imposed a standard presumptive sentence of 12 months' imprisonment on the aggravated assault conviction and concurrent sentences of 6 months' imprisonment on each conviction of criminal threat. The district court imposed a consecutive 6-month jail sentence for the misdemeanor domestic battery conviction but granted probation for 18 months. The district court also found that Hirsh used a deadly weapon, specifically a handgun, in the commission of the aggravated assault and imposed 15 years of violent offender registration under the Kansas Offender Registration Act (KORA). Hirsh timely appealed the district court's judgment.

Hirsh first argues that the district court's response to a jury question concerning the aggravated assault charge allowed the jury to convict him of an uncharged crime. Hirsh contests the district court's response to "refer to the jury instructions" when the jury asked whether a pillow could also be a deadly weapon. Instead, Hirsh argues, the district court should have answered "no" because the State charged Hirsh with aggravated assault by using a handgun as a deadly weapon. By failing to instruct the jury that the State was required to prove that Hirsh used a handgun, Hirsh argues that the district court permitted the jury to convict him of an uncharged crime—aggravated assault by using a pillow as a deadly weapon. Hirsh asserts this error was prejudicial because had he known the jury could have relied on a pillow as a deadly weapon, he would have altered his defense.

The State disagrees and asserts that because the elements of the crime were not changed, the district court's answer to the jury's question about whether a pillow could be a deadly weapon "was a mere variance" between the language of the complaint and the jury instructions. The State then points to a recent unpublished opinion by this court holding that a mere variance between the wording of the complaint and the language in the jury instructions does not merit reversal. The State also argues that the district court's response to the jury's question was irrelevant because the jury was not asking whether it could convict Hirsh of aggravated assault based on his use of the pillow alone; instead, the jury was asking if both a pillow and a handgun could be considered a deadly weapon.

An appellate court reviews a district court's response to a mid-deliberation jury question for an abuse of discretion. *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014). To the extent that it is necessary to determine whether the district court's response was a correct statement of the law, an appellate court is presented with a legal question, subject to unlimited review. 299 Kan. at 856. But when looking at which legally appropriate response the court should have made, an appellate court accords the district

court the deference of looking to whether no reasonable person would have given the response adopted by the district court. 299 Kan. at 856.

The Kansas criminal code addresses the district court's response to jury questions after a case is submitted for decision. After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request to be brought to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless the defendant waives his or her presence. K.S.A. 22-3420(3). When the jury asks a question about the district court's instructions, the district court must respond in some meaningful manner or seek additional clarification or limitation of the request. *State v. Boyd*, 257 Kan. 82, 88, 891 P.2d 358 (1995); *State v. Jones*, 41 Kan. App. 2d 714, Syl. ¶ 3, 205 P.3d 779 (2009), *rev. denied* 290 Kan. 1099 (2010).

Turning to our facts, the State charged Hirsh with aggravated assault as follows:

"[O]n or about March 12, 2013, in Barton County, Kansas, Darrin Duane Hirsh did unlawfully, feloniously, and knowingly place another person, to wit: Candice R. Hirsh, in reasonable apprehension of immediate bodily harm, with a deadly weapon, to wit: handgun, contrary to and in violation of K.S.A. 21-5412(b)(1)."

The district court instructed the jury, in part, as follows:

"To establish [aggravated assault], each of the following claims must be proved:
1. Darrin Hirsh knowingly placed Candice R. Hirsh in reasonable apprehension of immediate bodily harm.
2. Darrin Hirsh did so with a deadly weapon.
3. This act occurred on or about the 12th day of March, 2013, in Barton County, Kansas."

10

During deliberation, the jury asked the district court, "May the pillow be considered as a deadly weapon the same as a gun?" Over Hirsh's objection, the district court responded, "Please refer to the jury instructions." This issue is thus preserved for appellate review as Hirsh lodged a contemporaneous objection at trial to the district court's response to the jury question.

Hirsh cites *State v. Trautloff*, 289 Kan. 793, 217 P.3d 15 (2009), to support his claim that the district court's response to the jury question was erroneous because the court referred the jury to an instruction that was broader than the wording of the complaint. In *Trautloff*, the State charged the defendant with sexual exploitation of a child by "displaying" a picture of sexually explicit conduct by a child under 14 years of age. 289 Kan. at 801. However, the district court instructed the jury that sexual exploitation could include, "displaying," "promoting," or "producing" a picture. 289 Kan. at 801-02. The defendant did not object to the instruction at trial.

On appeal, our Supreme Court emphasized that the wording of a complaint is binding on the State and sets forth the theory upon which the State must base its case. 289 Kan. at 802-03. The court further determined that a "jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous. That error is excusable only where the substantial rights of the defendant are not prejudiced." 289 Kan. at 802. The court determined that the broad instruction allowed the jury to convict the defendant of "displaying *or* procuring *or* producing a photograph that included sexually explicit conduct of a child under 14 years of age. It did not compel the jury to find that [the defendant] displayed a picture, as was alleged in the complaint." 289 Kan. at 803. Under the facts of the case, our Supreme Court ultimately concluded that the district court's jury instruction was clearly erroneous. 289 Kan. at 803.

As the State points out in its brief, however, *Trautloff* does not require reversal of Hirsh's aggravated assault conviction because that case holds that a jury instruction on the

11

*elements* of a crime that is broader than the complaint is erroneous. 289 Kan. at 802. Here, the statutory element of the crime of aggravated assault was that Hirsh committed an assault with a "deadly weapon." See K.S.A. 2016 Supp. 21-5412(b)(1). As Hirsh acknowledges in his brief, the State's charging allegation that he used a handgun as a deadly weapon was "non-elemental surplusage." Generally, the State is not required to prove non-elemental surplusage in a complaint. See *State v. Kendall*, 300 Kan. 515, 531, 331 P.3d 763 (2014); but see *State v. Johnson*, 223 Kan. 185, 190-91, 573 P.2d 595 (1977) (caliber of the pistol used as a deadly weapon was surplusage, but reversal was required when the defendant relied on that surplusage in defending the case).

The State also argues that the district court's answer to the jury's question about whether a pillow could be a deadly weapon "was a mere variance," relying on this court's unpublished opinion in *State v. Vaughn*, No. 111,430, 2016 WL 367917 (Kan. App. 2016) (unpublished opinion), *rev. denied* 305 Kan. 1257 (2017). In *Vaughn*, the defendant was convicted, among other crimes, of aggravated robbery and attempted aggravated robbery. In the charging document for the aggravated robbery charge, the State described the property the defendant took as "to-wit: approximate[ly] $108.00 in cash." 2016 WL 367917, at *15. The district court's jury instruction simply described the property the defendant took as "property." 2016 WL 367917, at *15. In regards to the attempted aggravated robbery charge, the charging document described the overt act as: "to-wit: put the items in a trash bag in the living room." 2016 WL 367917, at *15. The jury instruction simply identified the overt act as "overt act." 2016 WL 367917, at *15.

On appeal, the defendant argued that the district court's jury instructions were impermissibly broader than the charges as reflected in the complaint. This court disagreed and distinguished the defendant's case from *Trautloff*. 2016 WL 367917, at *16-17. Ultimately, this court held that the differences between the wording of the charging document and the language in the jury instructions were "mere variances." 2016 WL 367917, at *19. This court concluded that the variances did not merit reversal of the

12

defendant's convictions because "neither [the defendant] nor the jury could have been confused by the variance." 2016 WL 367917, at *20.

Finally, the State argues that the district court's response to the jury's question was irrelevant because the jury was not asking whether it could convict Hirsh of aggravated assault based on his use of the pillow alone; instead, the jury was asking if both a pillow and a handgun could be considered a deadly weapon. The State speculates that the jury already had agreed that Hirsh used a handgun in committing the assault, and the jury simply wanted to know, hypothetically, if a pillow could be a deadly weapon "the same as a gun." We find this argument unpersuasive. More likely, the jury asked the question for a reason to help with its deliberations, and it may have been because some of the jurors had doubts about whether Hirsh used a handgun in committing the assault.

Both Hirsh and the State focus their appellate arguments on whether the district court's original jury instruction on aggravated assault was legally appropriate. But Hirsh did not object to the original jury instruction in district court, nor is he challenging the original jury instruction on appeal. The fact of the matter is that both a handgun and a pillow could be considered a deadly weapon to support an aggravated assault charge depending on the facts of the case. But here, the State elected to charge Hirsh with aggravated assault committed with a deadly weapon, to-wit:  a handgun. "The wording of a complaint is binding on the State in pursuing its theory before the jury." *Trautloff*, 289 Kan. at 802-03. Although Hirsh's use of a handgun is not a statutory element of aggravated assault, it is the State's theory of how he committed the crime. Because the State specifically charged Hirsh with aggravated assault committed with a handgun, the real question we must decide is whether the district court provided a meaningful response to the jury's question about whether the pillow could be considered as a deadly weapon.

We find the most instructive case on this issue is *State v. Vaught*, No. 109,425, 2015 WL 4460205 (Kan. App. 2015) (unpublished opinion). The facts in *Vaught* are very

13

close to what we have here. In that case, the defendant was charged with aggravated assault committed with a deadly weapon, to-wit: a .270 rifle. During deliberations, the jury asked whether the deadly weapon must be the rifle or whether it could be the defendant's hands. Over the defendant's objection, the district court simply referred the jury to the original instructions which defined aggravated assault as an assault committed with a deadly weapon.

On appeal, this court found that the district court failed to attempt to answer the jury's question in any meaningful way as required by statute and caselaw. 2015 WL 4460205, at *3. This court explained that it would have been very easy for the district court to inform the jury that, based on the way the defendant was charged, only the rifle could be considered as a deadly weapon and the not the defendant's hands. 2015 WL 4460205, at *3. This court concluded that the district court "abused its discretion here when it failed to comply with its statutory duty [in responding to the jury question]." 2015 WL 4460205, at *4. This court ultimately found the error was not harmless because under the facts of the case, there could have been some real confusion on whether the jury found the rifle or the defendant's hands to be the deadly weapon. 2015 WL 4460205, at *4. See *State v. Sanchez*, No. 106,547, 2012 WL 3290003, at *3-4 (Kan. App. 2012) (unpublished opinion) (reversing district court for failing to provide meaningful response to jury question); but see *State v. Madkins*, No. 114,715, 2017 WL 1198504, at *4-5 (Kan. App. 2017) (unpublished opinion) (finding no error under facts of that case), *petition for rev. filed* May 1, 2017.

We find the reasoning in *Vaught* to be persuasive. Here, the State specifically charged Hirsh with aggravated assault committed with a handgun. During deliberations, the jury asked the district court whether the pillow could be considered as a deadly weapon the same as a gun. The district court was required to at least attempt to respond to the jury's question in some meaningful manner or seek additional clarification from the jury. See K.S.A. 22-3420(3); *Boyd*, 257 Kan. at 88. Here, as in *Vaught*, it would have

14

been very simple for the district court to inform the jury that, based on the way Hirsh was charged, it must find that the deadly weapon was a handgun rather than a pillow. Such an instruction certainly would have been the most legally appropriate response to the jury's question. Under the facts of this case, we conclude the district court abused its discretion by failing to attempt to provide a meaningful response to the jury's question.

Of course, the district court's error is subject to harmless error analysis. In *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012), the Kansas Supreme Court held that to find an error harmless under K.S.A. 60-261, K.S.A. 60-2105, and the United States Constitution, a Kansas court must be able to declare the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." The party benefiting from the error always bears the burden of proving it harmless under this standard. See *State v. Logsdon*, 304 Kan. 3, 39, 371 P.3d 836 (2016).

Here, the evidence at trial presented a substantial issue about whether Hirsh used a handgun during the incident in question. When Candice told her friend, Stephanie, about the attack right after it happened, she did not mention a handgun. Likewise, Candice did not mention a handgun when she initially described the incident to her work supervisor, Schwartz, or when she initially told her father about the incident. Candice added the allegation about the handgun to her story later. During the trial, Hirsh argued that Candice's story lacked credibility due to inconsistencies in her various statements. In particular, Hirsh pointed to the fact that Candice did not mention that Hirsh used a gun during the assault in some of her initial reports about the incident.

Candice's claim that Hirsh physically attacked her on March 12, 2013, was corroborated by the bruising on her arms, back, and neck the next day. But the only evidence to support the allegation about the handgun was Candice's own testimony—and the jury obviously had some doubts about Candice's testimony as evidenced by the fact that Hirsh was acquitted of some of the charges. The district court also found there was a

15

fact issue on whether Hirsh used a handgun during the incident as evidenced by the fact that the court gave the jury a lesser included instruction on simple assault. We conclude the State has failed to meet its burden of proving that the district court's inadequate response to the jury question did not affect the verdict on the aggravated assault charge. Thus, we reverse Hirsh's conviction of aggravated assault, vacate the sentence on that conviction, and remand for a new trial on that charge.

MULTIPLICITOUS CONVICTIONS

Next, Hirsh claims that his two criminal threat convictions are multiplicitous because he made both threats at the same time. Hirsh argues that because his convictions stemmed from the same incident, he could not be charged with or convicted of two counts of criminal threat. The State, in turn, asserts that because Hirsh made two distinct threats—one against Candice and one against the children—he was properly charged with and convicted of two counts of criminal threat.

"[M]ultiplicity is the charging of a single offense in several counts of a complaint or information." *State v. Thompson,* 287 Kan. 238, 244, 200 P.3d 22 (2009). Multiplicity can result in multiple punishments for the same offense, thus violating the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. *State v. Pham*, 281 Kan. 1227, 1246, 136 P.3d 919 (2006). An appellate court has unlimited review over issues involving multiplicity as they present questions of law. 281 Kan. at 1246.

Whether a conviction is multiplicitous where the defendant is convicted of multiple violations of the same statute is determined by the "unit of prosecution test" announced in *State v. Schoonover*, 281 Kan. 453, 496-98, 133 P.3d 48 (2006):

16

"[T]he overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one? . . .

". . . If the conduct is discrete, i.e., committed separately and severally, the convictions do not arise from the same offense and there is no double jeopardy violation. If the charges arise from the same act or transaction, the conduct is unitary and the second component must be analyzed to see if the convictions arise from the same offense.

". . . [S]ome factors to be considered in determining if conduct is unitary, in other words if it is the "same conduct," include: (1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.

"2. *By statutory definition are there two offenses or only one*? The test to be applied to answer this question depends on whether the convictions arise from a single statute or from multiple statutes. If the double jeopardy issue arises from convictions for multiple violations of a single statute the unit of prosecution test is applied. . . .

". . . If the double jeopardy issue arises because of convictions on multiple counts for violations of a single statute, the test is: How has the legislature defined the scope of conduct which will comprise one violation of the statute? Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can only be one conviction for each allowable unit of prosecution."

Both components of the unit of prosecution test must be met for there to be a double jeopardy violation. Here, Hirsh's convictions for criminal threat arose from the same conduct. Both threats occurred at nearly the same time and the same location, and there were no intervening events or a "fresh impulse" motivating his conduct. So, the analysis turns to the second component: whether the conduct constituted one or more offenses based on the statutory definition of the crime. The statutory definition of the crime determines the allowable unit of prosecution, and there can only be one conviction per allowable unit of prosecution. 281 Kan. at 497.

17

The jury convicted Hirsh of two counts of criminal threat in violation of K.S.A. 2016 Supp. 21-5415(a)(1):

> "(a) A criminal threat is any threat to:
> (1) Commit violence communicated with intent to place another in fear, or to cause the evacuation, lock down, or disruption in regular, ongoing activities of any building, place of assembly or facility of transportation, or in reckless disregard of the risk of causing such fear or evacuation, lock down or disruption in regular, ongoing activities. "

In *State v. King*, 297 Kan. 955, 975, 305 P.3d 641 (2013), our Supreme Court explained that the unit of prosecution in a criminal threat case is "a single communicated threat; a communicated threat constitutes only one offense even if it is perceived and comprehended by multiple victims." The court held that the defendant's threat to get "off his property or he would shoot" only constituted one offense even though it was directed at three people because he only made one single communicated threat. 297 Kan. at 975.

Hirsh argues that his situation is analogous to *King* because "[t]he State seems to have prosecuted Mr. Hirsh on the theory that K.S.A. 21-5415(a)(1) creates multiple units of prosecution when an offender threatens to direct violence upon multiple individuals." But this argument is based on a flawed understanding of the conduct supporting his convictions. It is clear that one threat to multiple persons is only one unit of prosecution and, thus, multiple charges and convictions in such a scenario would be multiplicitous. See *State v. Williams*, 303 Kan. 750, 756, 368 P.3d 1065 (2016) (one threat directed at multiple persons is only one offense); *King*, 297 Kan. at 975. Accordingly, if Hirsh only made one threat directed to both Candice and the children, it would constitute only one offense and his convictions would be multiplicitous.

But Hirsh did not make just one threat directed to both Candice and the children; he made one single communicated threat against Candice and another single

18

communicated threat against his children. Specifically, while allegedly holding a gun to Candice's head, Hirsh told her "it will all be over soon." When Candice asked him not to let their children see her that way, Hirsh responded, "[d]on't worry because they're going with you." Hirsh communicated two separate threats against two separate victims; not just one threat that happened to be perceived by multiple victims. Under the unit of prosecution test, Hirsh's convictions of criminal threat are not multiplicitous because he committed two separate offenses under the criminal threat statute.

PROSECUTORIAL ERROR

Hirsh next argues that the State committed prosecutorial error during closing argument when the prosecutor told the jury that Candice told the truth while testifying. Hirsh asserts this constitutes prosecutorial error because prosecutors are not permitted to state a personal opinion on the credibility of their witnesses. Hirsh argues this error was prejudicial because Candice was the only witness to the alleged crimes, and to obtain a conviction, the State needed to convince the jury that Candice was credible.

The State asserts that the prosecutor's statement was not an expression of "her personal opinion on Candice's credibility." Instead, the State claims the prosecutor was referencing admitted evidence and this statement was within the wide latitude afforded to prosecutors. Even if, however, there was error, the State opines that it was harmless because the jury was instructed and reminded repeatedly that it was their job alone to determine the credibility of witnesses. Moreover, the State points out that Candice's testimony was corroborated by additional witnesses, so the State argues that it has met its burden in showing that any error was harmless.

Appellate courts employ a two-step process to evaluate claims of prosecutorial error. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, the court must determine whether error occurred by deciding whether the prosecutor's actions "fall

19

outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. If error has occurred, then the appellate court must determine whether the error prejudiced the defendant's right to a fair trial under the harmless error standard. "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109.

"'Generally, prosecutors cannot offer juries their personal opinions on the credibility of witnesses. We prohibit the prosecutor from expressing personal opinions on the credibility of a witness because such comments are "unsworn, unchecked testimony, not commentary on the evidence of the case." [Citations omitted.]'" *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012). Where a case turns on which of two conflicting stories is true, it may be reasonable to argue that based on the evidence, certain testimony is or is not believable; "[h]owever, the ultimate conclusion as to any witness' veracity rests solely with the jury." *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000).

Here, we find that the prosecutor committed error when she said that Candice was telling the truth. See *State v. Dull*, 298 Kan. 832, 837, 317 P.3d 104 (2014) (prosecutor committed error when he asserted that the story the victim told her mother was "the truth"); *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005) (prosecutorial error where prosecutor stated during closing argument "you know [victim] was telling the truth"). The prosecutor was essentially giving unsworn testimony regarding Candice's credibility, and the statement was outside the wide latitude afforded prosecutors in closing argument. See *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010).

We now turn to whether the error was harmless. Although the prosecutor opined that Candice's testimony was truthful, she also informed the jury that it was their job

alone to determine the weight and credibility to be given to each witness' testimony. The prosecutor did not repeat or emphasize her opinion that Candice's testimony was truthful. Moreover, Candice's testimony was corroborated by additional witnesses who saw Candice's injuries immediately after the incident. Finally, as pointed out by the State, the jury acquitted Hirsh on several counts; this shows that the jury did not blindly accept the State's assertion that Candice was telling the truth as it reached the opposite conclusion on several counts. Accordingly, when viewed as a whole, the prosecutor's error was harmless because there is no reasonable probability that "the prosecutor's momentary slip contributed to" Hirsh's guilty verdicts. See *Dull*, 298 Kan. at 838.

## ALLEGED *BRADY* VIOLATION

Next, Hirsh argues that the district court abused its discretion in denying his motion for new trial wherein he claimed that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), when Undersheriff Green's misconduct report against Deputy Reed was not disclosed until the last day of trial. This report, Hirsh asserts, contained impeachment evidence and, had it been disclosed earlier, there is a reasonable probability that the result of his trial would have been different.

The State argues that it never violated *Brady* because it had no opportunity to disclose the report earlier and, in any event, the report was disclosed prior to the end of the trial. The State also asserts that even if there was some inadvertent suppression of evidence by the State, it was harmless error because the evidence was not material.

To briefly review the facts, on the last day of trial, Hirsh called Green to testify in his defense. Green was the Undersheriff with the Barton County Sheriff's Office, but it was a KBI investigation of the case that led to criminal charges being filed against Hirsh. Green was familiar with the investigation into Candice's allegations because Candice's work supervisor, Schwartz, had told a relative, Sheriff's Deputy Reed, about Candice's

21

allegations. Eventually, Green learned about Reed's involvement with the case and wrote a misconduct report due to Reed's failure to report the information to an on-duty deputy or the duty officer. During cross-examination, the State noticed that Green had brought paperwork and documents to the witness stand. When asked about the contents of the documents, Green stated that it was the misconduct report concerning Reed. Green had never disclosed the report to the KBI, so the State was unaware until that moment that the report existed. The relevant portion read: "Deputy Reed said that Schwartz reported that she was told by Candice that [Hirsh] had placed a pillow over her head and threatened to shoot her with a firearm in the basement of their residence."

Hirsh argues that the State violated *Brady* by failing to disclose the misconduct report prior to trial. Hirsh claims that the misconduct report contained impeachment evidence because the report indicated that Hirsh attacked Candice in the *basement* of their residence, whereas Candice testified that the attack occurred in the bedroom.

The district court denied Hirsh's motion for a new trial after finding that Green's report was not material in that it would not have been likely to produce a different result on retrial. An appellate court reviews a district court's determination of whether a *Brady* violation occurred de novo, but with deference to the district court's factual findings. *State v. DeWeese*, 305 Kan. 699, 709, 387 P.3d 809 (2017). The district court's denial of a motion for new trial is reviewed under an abuse of discretion standard. 305 Kan. at 709.

The United States Supreme Court in *Brady* held: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. This means that prosecutors have an affirmative duty to disclose evidence favorable to the accused. *DeWeese*, 305 Kan. at 710. To establish a *Brady* violation, the court must find three elements: "'(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or

22

because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.'" *State v. Moore*, 302 Kan. 685, 700, 357 P.3d 275 (2015).

There was no *Brady* violation here because there was no suppression of any evidence by the prosecutor. The report in question was a misconduct report made by Green against Reed based on Reed's failure to report the incident involving Candice to an on-duty deputy or the duty officer in the sheriff's department. There is no way the prosecutor, an assistant attorney general, would have known of the misconduct report because Green admitted that he never disclosed the report to the KBI. Green was Hirsh's own witness, not the State's. The prosecutor learned about the report the same time as Hirsh learned about it—when Green was on the witness stand.

Even if there was some inadvertent suppression of evidence by the State, it was harmless because the evidence was not material. Green's description of the incident in question as taking place in the basement, rather than the bedroom, was based on third-hand information and could not have been used to effectively impeach Candice's testimony. Green never spoke directly with Candice. In fact, Reed never spoke directly with Candice. Candice told Schwartz about the incident who reported it to Reed and Green later wrote the report based on Reed's alleged misconduct. Moreover, Candice's account that the incident in question occurred in the bedroom, not the basement, was corroborated by three other witnesses—Stephanie Jacobs, Dave Jacobs, and Schwartz.

Kansas courts use a "reasonable probability" test in determining whether *Brady*'s materiality element is met: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Williams*, 303 Kan. 585, 597, 363 P.3d 1101 (2016). Here, there is no reasonable probability that had the evidence been

disclosed earlier, the result at trial would have been different; in fact, it is safe to say that it is unlikely that the evidence would have made any difference at trial.

REFUSAL TO RECALL THE JURY

Hirsh next claims the district court erred in refusing to recall the jury after an alternate juror disclosed that several of the jury members were victims of domestic violence but had not informed trial counsel of such during the jury selection process. Hirsh filed a motion for new trial alleging jury misconduct, but the district court denied his recall motion. Hirsh asserts that this was error because he alleged a plausible claim of juror misconduct, so there was just cause to recall the jury to investigate his claim.

The State disagrees and contends that there was no jury misconduct here. The State notes that the jurors were never asked if they were victims of domestic violence, so they were not required to disclose that fact to the court. Moreover, the State asserts potential jurors are not expected to volunteer information that may be important to trial counsel, and juror misconduct only occurs if jurors provide intentionally deceptive responses or nonresponses. Thus, the State asserts, there was no juror misconduct and the district court did not abuse its discretion in failing to recall the jurors.

After trial, an alternate juror, D.M., provided Hirsh with an affidavit alleging that after Hirsh's verdict was read, three female jurors shared their experiences with domestic violence. Specifically, one juror disclosed that she had been abused in a prior relationship, another juror stated that her ex-husband had put a gun to his own head and threatened to kill himself in front of her, and a third juror had some experience with domestic violence, although D.M. could not remember the specifics of that experience. The district court denied Hirsh's motion, finding that there was no juror misconduct because the jurors were never asked if they themselves had experienced domestic violence or had been victims of domestic violence.

24

An appellate court's review of a district court's decision on a motion to recall a jury is limited to abuse of discretion. *State v. Smith-Parker*, 301 Kan. 132, 165, 340 P.3d 485 (2014). If, however, a defendant's constitutional rights are implicated, the district court has limited discretion to deny such a motion. 301 Kan. at 165. Whether a defendant's due process rights were violated is a question of law over which an appellate court has unlimited review. 301 Kan. at 165.

Our Supreme Court has made clear that recalling the jury is an extraordinary measure that should not be undertaken lightly:

> "'Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their services has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order.'" 301 Kan. at 166 (citing *Walters v. Hitchcock*, 237 Kan. 31, 36, 697 P.2d 847 [1985]).

A district court abuses its discretion in denying a motion for new trial based on juror misconduct if the defendant establishes that an act of the jury constituted misconduct and the misconduct substantially prejudiced his or her right to a fair trial. *State v. Mathis*, 281 Kan. 99, 105, 130 P.3d 14 (2006). Here, the district court did not abuse its discretion in denying Hirsh's motion because he failed to establish that any juror misconduct occurred. Counsel never asked any of the jurors at issue whether they personally had experienced domestic violence or knew someone who had experienced it. Instead, counsel asked:

25

"As we have discussed, some of these allegations are domestic violence allegations. Anybody feel, by virtue of their experiences, their past, or you know, past experience of a loved one that they can't sit fairly and impartially on this jury? . . . Does everybody feel that they can put aside and sit fairly and impartially on this jury if they're chosen?"

The jurors who allegedly failed to disclose they had experienced domestic violence did not commit any misconduct because there is no indication that they ever gave any false or misleading answers to the court. The jurors were asked a general question about whether they ever had experiences in their own lives that would prevent them from being fair jurors. The only thing we can discern from the nonresponse is that the jurors in question thought that they could still be fair and impartial. Contrary to Hirsh's assertion, the jurors were not required to volunteer information that they had experienced domestic violence without being asked.

Though intentionally deceptive responses or nonresponses do constitute misconduct, jurors are not required to volunteer information that they think or suspect may be of interest to counsel. *State v. Hopkins*, 257 Kan. 723, 726, 896 P.2d 373 (1995). In *Hopkins*, the defendant was convicted of rape and later argued jury misconduct because a juror failed to disclose that his former girlfriend had been a victim of rape. Our Supreme Court made clear: "Potential jurors are not required to be mind readers. Juror misconduct must be based on more than the failure to volunteer information a potential juror speculates or surmises is important to counsel." 257 Kan. at 726.

Thus, the *Hopkins* court found no juror misconduct occurred because the juror was never asked if he knew anyone who had been a victim of rape. 257 Kan. at 726. By the same reasoning, the district court here did not abuse its discretion in denying Hirsh's request to recall the jury because the jurors were not required to spontaneously volunteer that they personally had experienced domestic violence without being asked. See, e.g., *State v. Musick*, No. 99,820, 2009 WL 1858242, at *2-3 (Kan. App. 2009) (juror not required to volunteer that she herself had previously worked for law enforcement when

asked if she knew any law enforcement officers), *rev. denied* 290 Kan. 1101 (2010); *State v. Todd*, No. 98,145, 2008 WL 5428174, at \*6 (Kan. App. 2008) ("It cannot be misconduct for [a juror] to fail to disclose information she did not know she was required to disclose."), *rev. denied* 289 Kan. 1285 (2009).

CUMULATIVE ERROR

Hirsh asserts that if any of the trial errors standing alone were insufficient to warrant reversal of his convictions, the combined effect of the errors rendered his trial "fundamental[ly] unfair." Thus, he contends that under the cumulative error doctrine, this court must reverse his convictions and remand his case for a new trial.

Though any one single error may not warrant reversal of any convictions, those errors when considered collectively may be so serious as to merit reversal. *State v. Blanchette*, 35 Kan. App. 2d 686, 708, 134 P.3d 19, *rev. denied* 282 Kan. 792 (2006). "The reversibility test for cumulative error is 'whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citations omitted.]" *State v. Williams*, 299 Kan. 1039, 1050, 329 P.3d 420 (2014). The doctrine does not apply if there is no error or only one error supporting reversal. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

Though there were two trial errors here—the district court's answer to the jury question and the prosecutor's statement that Candice was telling the truth—cumulative error does not require reversal of all of Hirsh's convictions. As we have explained, we are reversing Hirsh's aggravated assault conviction due to the district court's error. The remaining error committed by the prosecutor in closing argument is not so serious as to merit reversal of all of Hirsh's convictions.

Finally, Hirsh argues that requiring him to register as a violent offender pursuant to K.S.A. 2016 Supp. 22-4902 violates his constitutional rights in the manner proscribed by *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Specifically, he contests the judge's finding that because Hirsh committed a crime with a deadly weapon, he was thus subject to violent offender registration under KORA. Instead, Hirsh asserts, *Apprendi* requires that whether he committed a crime with a deadly weapon is a question that should have been submitted to the jury because it is a fact that increased the penalty for his crime.

The State disagrees and first points out that offender registration is not punishment, so *Apprendi* does not apply. However, even if offender registration is considered to be punishment as part of Hirsh's sentence, the State asserts that because the jury found that Hirsh used a deadly weapon when convicting him of aggravated assault, *Apprendi* is satisfied. Whether a violation of *Apprendi* has occurred is subject to unlimited review by this court. *State v. Potts*, 304 Kan. 687, 705, 374 P.3d 639 (2016).

After the trial, the State filed a motion for the district court to find that Hirsh is a violent offender subject to KORA based specifically on his conviction of aggravated assault committed with a handgun. At the sentencing hearing, the district court found that Hirsh used a deadly weapon, specifically a handgun, in the commission of the aggravated assault and imposed 15 years of violent offender registration under KORA. Because we have reversed Hirsh's conviction of aggravated assault and vacated his sentence on that count, which includes the order for registration under KORA, we do not need to address Hirsh's claim that the registration order violates his constitutional rights under *Apprendi*.

Affirmed in part, reversed in part, vacated in part, and remanded.

28